**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

CRIMINAL CASE NO. 5:26-MJ-3173-EBA

IN THE MATTER OF CRIMINAL
COMPLAINT FOR TAVIS CHENAULT

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

* * * * * * * * *

I, Todd Phillips, a Task Force Officer ("TFO") of the Federal Bureau of Investigation ("FBI"), having been first duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an FBI TFO as well as a Sergeant over the Gang Unit at the Lexington Police Department ("LPD"). I have been in law enforcement for 22 years, 5 months. Over 20 years of my career has been working gangs and organized/enterprise crime. I have had extensive training in police intelligence, investigations, gangs, guns, drugs and police tactics. I am considered a gang expert in most courts in the state of Kentucky and have testified as a gang expert in Federal Court. My current role is as a Task Force Officer with the FBI's Safe Streets Squad extending my responsibilities in investigating enterprise crime.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable

cause for the issuance of a criminal complaint for Tavis Chenault ("Chenault," aka "T"). Based on the facts set forth in this affidavit, there is probable cause to believe that Chenault violated 21 U.S.C. § 846, by conspiring to distribute 400 grams or more of a mixture or substance containing fentanyl.

## PROBABLE CAUSE

3. Affiant has been familiar with Tavis Chenault (aka: T) since his drug and gun arrest in Lexington, KY in September 2019. Over the course of the last twelve months, law enforcement has received source reporting that Chenault is involved in drug trafficking of various types of narcotics to include fentanyl and methamphetamine. Reports are that Chenault was working closely with Phillip White ("White") who was charged with drug trafficking in January 2026, and David Campbell ("Campbell") who was charged with drug trafficking in April 2026. White and Campbell are both in federal custody. [While local authorities charged Campbell for the April 2026 drug trafficking activity, he is in federal custody for a supervised release violation for the same conduct.]

4. One source reported that Chenault is the cousin of Campbell's wife, Netoria Campbell ("Netoria"), and that Chenault and Campbell are close.

5. During one source interview, Chenault was described as Campbell's chemist.

6. Prior to Campbell's arrest, law enforcement became aware through source reporting that Campbell and Chenault were trafficking and storing narcotics inside a home at 3252 Leestown Road ("the Leestown residence"). Law enforcement conducted surveillance on this location on multiple occasions and confirmed both Campbell and Chenault were regularly seen at this address and were moving items inside and outside

of the home. After Campbell's arrest, he confessed to using the Leestown residence to fly contraband by drone into Federal Medical Center (a federal prison) on Leestown Road.

7. Also, prior to Campbell and White's arrest, law enforcement became aware from source reporting that Chenault and the group were trafficking fentanyl and methamphetamine out of a home located at 2621 Longleaf Place, in Lexington, KY ("the Longleaf residence"). Affiant and FBI personnel conducted surveillance on the home for months and initially observed White and Chenault coming and going from the Longleaf residence regularly with short stays and meeting subjects known to traffic narcotics. After White was arrested for trafficking fentanyl by the DEA, FBI then observed Campbell and Chenault coming to and from the Longleaf residence with suspicious short stays, often pulling into the garage and closing the door for minutes, then opening the door and leaving. After Campbell was arrested, Chenault continued the suspicious short stay stops at the Longleaf residence with subjects arriving on a regular basis that were known to traffic narcotics.

8. Law enforcement has received source reporting that Chenault uses several different cell phones to conduct his drug transactions to avoid Law Enforcement. One of the phone numbers provided from source reporting that Chenault has had for multiple months is 859-351-5349 ("the 5349 account" or "the 5349 number"). Law enforcement corroborated this information through jail communications.

9. Hereafter, all dates occurred within sixty days of the submission of this affidavit and all events occurring within that sixty-day period are discussed

chronologically. These dates are known to law enforcement but shielded herein to protect investigative details and witnesses.

10. During surveillance at the Longleaf residence in early summer 2026, law enforcement observed a subject who appeared to be Chenault exiting the residence and going to his darker colored red Dodge Charger while wearing a white t-shirt and black surgical gloves —behavior consistent with source reporting that Chenault acted as the "chemist." Chenault then drove the vehicle out of the driveway and out of view of surveillance.

11. At some point in summer 2026, Chenault appeared to have moved his drug operation away from the Longleaf residence.

12. In summer 2026, law enforcement applied for and received a search warrant for locational data for the 5349 account.

13. Law enforcement has conducted surveillance on Chenault multiple times to track his movements between drug drop locations. Chenault consistently switches vehicles and drives recklessly, even with heavy traffic making him difficult to follow and safely gather information and evidence. On more than two occasions, Chenault has been observed travelling with multiple other vehicles and subjects suspected of being part of his drug trafficking organization. During all those encounters, the subjects drove in a manner, even in heavy traffic that was reckless and it was difficult to continue surveillance. On multiple occasions, Affiant observed Chenault driving a white Dodge, Ram with Kentucky license plate T5N273 ("the Dodge Ram").

14. Later, while conducting surveillance utilizing locational data from the 5349 account, law enforcement observed the cell phone in the general location(s) where FLOCK camera systems show the Dodge Ram. Law enforcement also went to one of the areas where locational data showed Chenault's cell phone stopped—581 Delzan Place, Lexington, KY ("the Delzan location")—and observed the Dodge Ram parked. Further research into associates of Chenault showed that A.H., a person known to associate with Chenault and previously seen at the Longleaf residence, resided at the Delzan location.

15. In summer 2026, Affiant submitted a search warrant to place a tracking device on the Dodge Ram.

16. Later, "Person 1" reported that Campbell, who was in custody, wanted his out-of-custody associates to sell several kilograms of fentanyl. Source 1 understood that Campbell's "girl" would visit Campbell to obtain the information about the purchaser. Because Campbell has one wife and two girlfriends, law enforcement worked to ascertain which "girl" would be receiving the information. Law enforcement also followed leads on the prospective purchaser. The date of Person 1's report is hereafter described as "D-Day."

17. Jail communications indicate that Netoria visited Campbell the day after D-Day. Jail communications also indicate that, on the same day, Campbell's girlfriend, Ravion Jackson ("Jackson"), told him that he has a lot going on inside jail and outside jail; he does not know how to "chill;" he is doing all this "extra shit;" and he needs to try to stay on the "motherfuckers' good side." Campbell told her that bed was already

made. He also said that no one was going to manipulate him to limit access to his own shit, specifically the shit that put him where he is at. [Recall that Campbell is currently in custody for a supervised release violation for drug trafficking.] Shortly thereafter, Campbell instructed Jackson to communicate with someone and that the person was expecting the communication.

18. On the same day, Jackson—using telephone number (859) 913-4986 ("the 4986 number")—contacted a prospective purchaser ("Person 2"). Jackson contacted Person 2 specifically about the purchase of fentanyl. Person 2 told Jackson that "Face" would be funding the purchase. Jackson discussed the cost of the kilogram and offered to provide Face with a "tester."

19. Law enforcement confirmed that the 4986 number belongs to Jackson.

20. Within few days of D-Day, Person 2 sent a message to Jackson stating that Face would buy an 8-ball of fentanyl to test. Later the same day, jail communications show Campbell messaging the 5349 number, instructing him to contact a person who was "on standby." [Recall that Chenault uses the 5349 number.] The 5349 number responded, "did." The following day, the 5349 number texted Person 2, stating that the tester would be delivered the next day.

21. The 5349 number communicated with Person 2 about the meet location. Investigators who were familiar with Chenault and his voice from previous investigations recognized Chenault's voice as the person speaking to Person 2. A vehicle that law enforcement knows Chenault to frequently use arrived at the meetup location. Person 2 then received the tester from Chenault.

22. Following the exchange, Person 2 told Chenault that he/she delivered the tester and that Face would like a brick or two soon thereafter. Chenault responded affirmatively, confirming Chenault to be a part of the larger, kilogram-level deal with Campbell and that this tester was to assist in the larger deal.

23. The day after Chenault delivered the tester, Face indirectly expressed dissatisfaction with the "stepped on" or diluted nature of the tester and requested a discount, spurring further discussion within Campbell's drug trafficking network.

24. Jail communications revealed the following exchange between Campbell and Chenault:

- Campbell: "Yeah, they tell, uh, said that uh, the rest of that rental car wasn't clean enough."
- Chenault: "Alright."
- Campbell: [Inaudible noise.]
- Chenault: "The hell, that's impossible to."
- Campbell: "You say what?"
- Chenault: "I said that's impossible."
- Campbell: "Yeah. I said damn. "
- Chenault: "Cuz I Cuz I got--the rental car I gave up is the one that you and my people's I rented to. Is the one y'all, y'all, you feel me. 50/50 on."
- Campbell: "Yeah."

25. Law enforcement believes that, in this communication, Campbell and Chenault are speaking in code about the fentanyl sample that Chenault provided to Person 2. Investigators know it is common for gang members to utilize vehicle terminology to discuss their gang/territory affiliations and various aspects of business deals. Campbell appears to be stating that Face complained that the tester was full of "cut" and not very pure. Chenault responded defensively stating multiple times that was

impossible. At one point Chenault admitted to Campbell the sample was cut 50/50, which should not have created a problem.

26. In a chirp conversation later that day, Chenault expressed hesitation about the deal with Face. Campbell responded that purchasers who request testers do not set people up. Campbell added he would never set his own guys up or would put them in danger. Chenault responded that he knows, "loves" Campbell, and would contact "dude" [Face] tomorrow.

27. Campbell also discussed the issue with Jackson via the jail communication platform. In the conversation, Jackson and Campbell discussed concerns that the "car is off," which investigators believe refers to the poor quality of the fentanyl being sold to Face. Campbell made the statement that it had all gotten worked out and talked about Chenault acting "weird." At one point, Campbell told Jackson to relay, likely to Chenault, to take the drugs to his people so they can do the final deal with Face. Campbell also seemed concerned that the mixture was not correct and believed Chenault was going in to mix it "with his head all fucked up." During the call, Campbell gets frustrated about the mix saying that the mix included powdered sugar. This is the same substance that was found in the fentanyl sample upon field testing.

28. Approximately one week after D-Day, Netoria delivered a second tester to Person 2. Law enforcement also surveilled Netoria and observed her traveling from her home to the meetup location with Person 2. Law enforcement field tested the sample delivered by Netoria and confirmed the presence of fentanyl.

29. Netoria then agreed to distribute a kilogram of fentanyl on behalf of Campbell. After Netoria arrived at the meetup location, investigators filmed and photographed Netoria leave her vehicle holding the packaged kilogram of fentanyl, get into Person 2's vehicle, then leave Person 2’s vehicle carrying a bag. Law enforcement field tested the suspected fentanyl, weighing just under a kilogram, confirming the presence of fentanyl.

30. In summary, Campbell orchestrated the distribution of the two testers and one kilogram of fentanyl described herein; Jackson facilitated communication with Person 2 about the deal; Chenault delivered one tester to facilitate the kilogram-level deal; Netoria delivered one tester to facilitate the kilogram-level deal; and Netoria delivered the kilogram of fentanyl.

31. Local authorities charged Chenault and Netoria on August 13, 2026, and planned to arrest them and conduct searches of their residences on the morning of August 14, 2026. Chenault was not present at his residence, so his arrest has not yet been effectuated on violations of Kentucky law.

## CONCLUSION

32. For the reasons stated herein, I submit that this affidavit supports probable cause that Tavis Chenault violated 21 U.S.C. § 846 by conspiring to distribute 400 grams or more of a mixture or substance containing fentanyl.

Respectfully submitted,

Todd Phillips, by EBA with affiant's permission

Todd Phillips
Task Force Officer
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me this 14 day of August 2026.

Signed By:
Edward B. Atkins EBA
United States Magistrate Judge

Edward B. Atkins
United States Magistrate Judge
Eastern District of Kentucky